**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **GIRIJA NAIR,** | : | |
| **Plaintiff,** | : | **Case No. 2:02-cv-595** |
| **v.** | : | **Judge Holschuh** |
| **COLUMBUS STATE COMMUNITY COLLEGE,** | : | **Magistrate Judge King** |
| | : | |
| **Defendant.** | : | |
| | : | |

<u>**MEMORANDUM OPINION & ORDER**</u>

Plaintiff Girija Nair ("Plaintiff"), who is of Indian national origin, brought this suit against Defendant Columbus State Community College ("Defendant") alleging national origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) <u>et</u>. <u>seq</u>., and Chapter 4112 of the Ohio Revised Code. This matter is currently before the Court on Defendant's Motion for Summary Judgment on All Claims. (R. at 54.) For the following reasons, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

**I.     Background**[1]

Plaintiff was born in India and is a Hindu. (Decl. of Girija Nair ¶ 1, Pl. Mem. Contra, R. at 58 ("Nair Decl.").) After obtaining a bachelor's degree in mathematics and completing some graduate work at Indian universities (Nair Decl. ¶ 2), Plaintiff moved to the United States. (<u>Id.</u> at

---

[1] Defendant, in its Reply, points out that the parties agree that most of the events leading up to this lawsuit actually happened, and that the parties "disagree[] only as to the details and their significance." (Def. Reply p. 6, R. at 64.) It is well settled that, on a motion for summary judgment, all the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986). Therefore, the details and significance of these events are presented and evaluated in the light most favorable to Plaintiff.

¶ 3.)  Plaintiff subsequently obtained bachelor's and master's degrees in mathematics from Florida Atlantic University, and later pursued a Ph.D. at Ohio State University.  (Id. at ¶¶ 3, 7.)  Plaintiff later sought a college teaching position and moved to Columbus to accept a position as a full-time, nontenured developmental mathematics instructor in Defendant's Developmental Education Department ("DED" or the "Department").  (Id. at ¶¶ 3, 4, 6; Tim D. Wagner Aff. ¶ 2, Def. Mot. Summ. J. App. A, R. at 54 ("Wagner Aff.").)

The DED employs both mathematics and English faculty members, and "provides remedial education to incoming students to give them the basic skills needed to succeed in college-level courses." (Celeste F. Bland Aff. ¶ 2, Def. Mot. Summ. J. App. D, R. at 54 ("Bland Aff.").)  The DED uses a "departmentalized" approach to teaching in which Lead Instructors, who are senior faculty members, prepare the curriculum that other DED faculty are required to use. (Nair Decl. ¶¶ 8, 12.)  When Defendant hired Plaintiff, Patricia Cass ("Cass") was the Lead Instructor.  (Id. at ¶ 9.) Shortly after Plaintiff's arrival Cass resigned her position, and Kelly Sanchez ("Sanchez")[2] became Lead Instructor.  (Id. at ¶ 9.)  Plaintiff was hired by DED Chair Dr. Kevin May.  However, shortly after Plaintiff joined the DED, Dr. May left Defendant's employ and Nancy Laughbaum ("Laughbaum"), a faculty member in the DED, became the Interim Chair.  (Id. at ¶ 11.)

Plaintiff soon began to feel singled out and unsupported in the DED.  During Plaintiff's first year and a half with Defendant (September 1997 to May 1999), faculty members criticized her for being rude and abrasive to other faculty members when she, for example, did not say hello and goodbye.  (Id. at ¶ 30; Patricia Cass Dep p. 44-45, Holly Finnegan Dep. p. 18, Kelly Sanchez Dep.

---

[2] When Plaintiff joined the DED, Sanchez was known as Kelly Goldenetz.  She subsequently changed her name, and for clarity the Court will refer to her as "Sanchez" throughout.

p. 32-38, Pl. Mem. Contra, R. at 58.) Sanchez and Laughbaum frequently did not believe Plaintiff was telling the truth about personal matters and her reasons for missing classes, such as being snowed in and that Plaintiff's daughter was ill. (Nair Decl. ¶ 31; Sanchez Dep. p. 52.) Plaintiff alleges she was labeled a "non-team player" because she didn't attend Department potluck lunches and was accused of not following Departmental policies because she did not agree with the DED's departmentalized approach. While other faculty members did not attend these lunches or disagreed with Departmental policies, Plaintiff alleges they were not singled out and criticized. (Nair Decl. ¶ 32-34.)

Plaintiff asserts that she was treated this way because of her national origin. When Plaintiff arrived in Columbus in September 1997, her furniture was not delivered on time. Plaintiff commented to Sanchez about how this upset her, and Sanchez allegedly responded by saying "that [Sanchez] was surprised how 'demanding' [Plaintiff] was since in India 'people die of starvation.'" (Id. at ¶ 21.) Sanchez and Laughbaum also criticized and mocked Plaintiff's accent, and wondered if students would be able to understand her. (Id. at ¶¶ 22, 28.) Additionally, Michelle Branner ("Branner"), a counselor in the DED, mocked Plaintiff's national origin and religion. While eating a vegetarian lunch,[3] Plaintiff alleges Branner sarcastically asked Plaintiff if she was worshiping animals and then mocked Indian and Hindu beliefs. (Id. at ¶ 24.) Despite Laughbaum's admonition to stay quiet, Plaintiff approached Defendant's Equal Employment Opportunity Officer, Dr. Al Simmons ("Simmons"), to complain about this disparate treatment. Simmons told Plaintiff that the

---

[3] Many Hindus, like Plaintiff, are vegetarians because of their belief in nonviolence and respect for animal life. Even among Hindus who do eat meat, however, cows are particularly respected because of their central role in the pastoral origins of the first practitoners of Hinduism, and Hindus do not consume beef.

DED was "notorious" for mistreating foreigners.  (Id. at ¶ 26.)[4]  Plaintiff did not file a formal complaint at that time, however, and Simmons advised Plaintiff to wait and see if the situation improved.  (Id.)  Later, in the summer of 1999 at a conference, Sanchez, Cass, and other DED faculty members decided that Plaintiff had "had her chances" in the Department.  They decided to begin looking for ways to get rid of Plaintiff, and resolved to start documenting things.  (John Wallace Dep. p. 16, 74-76 ("Wallace Dep."), Pl. Mem. Contra, R. at 58.)

Despite this treatment, however, Plaintiff performed well in her duties.  Laughbaum observed Plaintiff's classroom performance in May 1998 and gave Plaintiff a good review, stating that Plaintiff obviously enjoyed teaching.  (Id. at ex. D.)  In May 1998 Laughbaum also appraised Plaintiff's performance, and stated that Plaintiff was organized, followed Departmental outlines, and was supportive to her students.  (Id.)  Additionally, Plaintiff received four letters, one for each quarter she had taught so far, from R. Michael Snider ("Snider"), Defendant's Provost, congratulating Plaintiff on her excellent student appraisal scores.  (Id. at ex. Y.)  Laughbaum observed Plaintiff again in February 1999.  While Laughbaum still gave Plaintiff an overall good review and noted that Plaintiff treated her students with respect, Laughbaum stated that Plaintiff was behind in her paperwork, often forgot to read memos, and had problems with departmentalized courses.  Plaintiff disputed these comments.  (Id. at ex. D.)  Laughbaum last appraised Plaintiff in early June 1999 and stated that Plaintiff needed to work on her compliance with Department rules

---

[4] Defendant objects to admitting Simmons' statements on the ground that it is inadmissible hearsay.  (Def. Reply p. 8, R. at 64.)  However, the Court finds that Simmons' statement is not hearsay because it is an admission of a party-opponent under FED. R. EVID. 801(d)(2)(D).  Simmons' statement about the DED's treatment of foreigners was certainly within the scope of his employment as Defendant's EEO Officer.  See Carter v. University of Toledo, 349 F.3d 269, 276 (6th Cir. 2003); FED. R. EVID. 801(d)(2) advisory committee note (calling for "generous treatment of this avenue to admissibility").

and regulations, her organization, and on being a team player. Laughbaum also asserted that, while Plaintiff's student evaluation scores were high, there were also lots of student complaints about Plaintiff. Plaintiff disagreed with all of Laughbaum's comments, but stated that she was willing to work with the Department to improve. (Id.)

In May 1999, Laughbaum returned to her normal faculty duties and Celeste Bland ("Bland") became Chair of the DED. (Id. at ¶ 11.) Plaintiff and Bland had a contentious relationship, and Plaintiff asserts that Bland "seemed to have a vendetta" against Plaintiff. (Id. at ¶ 35.) Plaintiff asserts that Bland frequently made up the rules as she went along and constantly changed her expectations for the members of the Department. (Id. at ¶ 41.) Other individuals both within and outside the DED held the same opinion. (Decl. of Jane E. McDowell ¶¶ 9, 12 ("McDowell Decl."), Wallace Dep. p. 37, Pl. Mem. Contra, R. at 58).

Plaintiff also states that, from May 1999 until the time Plaintiff left Defendant's employ, Bland demonstrated a discriminatory attitude towards Plaintiff based on Plaintiff's national origin. In the summer of 1999, Bland asked Plaintiff to come to her office immediately. When Plaintiff responded that she was eating, Bland made derogatory remarks about Indians eating with their hands. (Nair Decl. ¶ 40.) In the spring of 2000, Bland questioned Plaintiff about a lunch expense Plaintiff accrued while at a conference. Plaintiff responded that, because she is a vegetarian, she could not eat the food provided at the conference. Bland responded "oh! The cow thing," and refused to reimburse Plaintiff for the lunch expense. (Id. at ¶ 36.) That same spring, Bland allegedly told Plaintiff that "no matter how smart [Plaintiff] was, 'a light complected, African-American female' like [Bland] would always be more respected in society than 'someone dark skinned' like [Plaintiff]." (Id. at ¶ 39, ex. U.) Bland also told Plaintiff about a friend of Bland's who fired a

5

Somalian woman for wearing traditional clothing.  Plaintiff states that Bland then said that foreigners cheat companies by finding all sorts of excuses and creating special circumstances for themselves.  (Id. at ¶ 38.)  Later, in November 2000, Bland again questioned Plaintiff about a food expense at a conference.  When Plaintiff again responded that she is vegetarian and could not eat the food at the conference, Bland replied that "'you people' would rather 'save a bunch of cows' than 'feed hungry people,'" and cut Plaintiff's food allowance for the conference.  (Id. at ¶ 37, ex. B.)

The specific events that led to Defendant refusing to renew Plaintiff's teaching contract began late in 1999.  On September 29, 1999 Plaintiff requested that she not be placed on the Department's substitute teacher list, in part because faculty members were not paid for their substitute duties.  (Id. at ex. Q.)  Bland responded by stating that all full-time faculty must be available to substitute without pay, unlike in all of Defendant's other departments, where substitutes are paid.  (McDowell Decl. ¶ 8.)  After much back and forth between Plaintiff and Bland, on November 9, 1999 Plaintiff agreed to be placed on the substitute list despite the fact that two other faculty members had also refused to sign the list.  (Nair Decl. ex. Q.)

Ten days later, on November 19, 1999, Plaintiff was ill and could not work.  While Defendant's other departments placed responsibility for obtaining substitutes on the administration (McDowell Decl. ¶ 9), Bland required DED faculty, when absent, to identify the Lead Instructor (in this case, Sanchez) and then obtain their own substitute.  (Nair Decl. ex. Q.)  On the 19th, Plaintiff found substitutes for all her classes and left a message for Bland prior to 9:00 a.m., informing her that Plaintiff would be absent.  (Id. at ¶ 62.)  At 9:00 a.m., Bland called Plaintiff and began shouting at Plaintiff for not notifying the Department.  Bland alleged that a student had been waiting outside

Plaintiff's door from 7:00 a.m. until 8:00 a.m., and that Plaintiff's failure to notify the Department prejudiced this student. Plaintiff states that Bland was angry during this phone conversation and repeatedly interrupted Plaintiff. (Id. ex. M.) Bland met with Plaintiff on November 22, 1999 to discuss the incident. Bland stated that Plaintiff failed to follow Department procedures, and that Plaintiff had exhibited an "abrasive attitude towards an immediate supervisor." (Bland Aff. ¶ 4.) Bland alleges that Plaintiff became confrontational during this meeting, and that Bland had to terminate the meeting. (Id. at ¶ 5.)

Two weeks later, on December 9, 1999, Plaintiff arrived at Bland's office for a regularly scheduled meeting. Present at the time was the Department Secretary, Karen Gee ("Gee"). Plaintiff, who was not aware of the meeting's purpose, did not initially object to Gee's presence. After the meeting began, however, Bland presented Plaintiff with a "written oral warning" documenting the November 22nd meeting. (Nair Decl. ¶¶ 63, 64, ex. H, M.) Plaintiff immediately objected to Gee's presence at what had become a disciplinary meeting because Plaintiff felt she had a right to privacy, and noted that she had not read the written warning and that she wanted an opportunity to reply to it. (Id.) While Bland asserts that Plaintiff became confrontational (Bland Aff ¶¶ 7, 8), Plaintiff alleges that Bland is the one who became confrontational after Plaintiff objected to the written warning and Gee's presence. (Nair Decl. ¶¶ 63, 64, ex. H, M.) A month and a half later, on January 27, 2000, Bland gave Plaintiff another written warning, this time for Plaintiff's alleged inappropriate and "insubordinate" behavior at the December 9th meeting. Plaintiff wrote on the bottom of the warning, "I disagree with the contents of this letter. However now I have a better understanding of who my boss Celeste Bland is and how she operates. So I say whatever!" (Id. at ¶ 66, ex. I; Bland Aff. ¶ 9, ex B.)

Over the next 11 months, Plaintiff and Bland had multiple confrontations.  While Plaintiff was nominated as a finalist for Defendant's Distinguished Teacher Award (Nair Decl. ¶ 51, ex. E) and continued to receive congratulatory letters from Snider about her excellent student appraisal scores (id. ex. Y), Bland's observation reports and appraisals criticized Plaintiff's organization and large number of absences.  (Id. ex. D.)  Bland also noted a drop in Plaintiff's student evaluation scores and a large number of student complaints, and stated that Plaintiff was not a team player, did not follow directions, and did not communicate well with supervisors and colleagues. (Id.)  Plaintiff disputed all of Bland's statements and complained that her appraisal was unfair and nonsupportive. Plaintiff complained that the Department did not support her, that the charge of student complaints was vague, and that Bland talked down to Plaintiff.  (Id.)  Plaintiff also noted that her student evaluation scores had never dropped below a 4.4 on a 5.0 scale, and that she had continually received letters from Snider congratulating her on her scores.  (Id.)  Plaintiff alleges that Bland became angry and rude when Plaintiff disagreed with the appraisal.  (Id. ex. M.)

Defendant also points out many other specific instances of Plaintiff's conduct during this time period that Bland and other DED faculty, apparently, had documented.  In early 2000, Plaintiff volunteered to assist Sanchez with administrative duties, but did not show up one day and accidentally deleted student records another day.  (Bland Aff. ex. C.)  Plaintiff agrees that she missed a day, but states that she notified Sanchez and compensated by assisting on two other days. Plaintiff also admits to accidentally deleting the records, but asserts that no harm occurred because one instructor's list was not affected and Plaintiff fixed the other instructor's list to that instructor's satisfaction.  Plaintiff was not told at the time that this incident was a problem.  (Nair Decl. ex. M.) On May 22, 2000, Plaintiff volunteered to assist Cass in revising a test.  Bland alleges that Plaintiff

did not complete the assignment despite ample time in which to do so. (Bland Aff. ex. C.) Plaintiff counters by noting that Cass never gave Plaintiff a deadline. Again, at the time Plaintiff was not informed that this incident was a problem. (Nair Decl. ex. M. attach. 3.) In August 2000 Plaintiff borrowed a Department laptop, which Bland claims had to be "retrieved" from Plaintiff. (Bland Aff. ex. C.) Plaintiff, however, states that she used the laptop for an extra weekend and returned it to the computer lab herself with no objections, and again Plaintiff was not informed that this was a problem. (Nair Decl. ex. M.)

In September 2000 Bland accused Plaintiff of making comments that upset an adjunct faculty member, which Plaintiff denied. Bland proposed meeting with the adjunct, and Plaintiff responded that she was indifferent as to the adjunct's presence. Bland pushed Plaintiff for a yes or no answer and, when Plaintiff reiterated that she was indifferent, Plaintiff states that Bland became angry and confrontational and accused Plaintiff of "playing games." (Id.) Later in September Plaintiff submitted her grades electronically and provided Gee with a copy of her grade book. Gee stated that she needed a hard copy of the online grade entry, despite the fact that Gee would receive a print-out in a couple of days from the administration. Bland later accused Plaintiff of not submitting her grades on time, but did not bring this to Plaintiff's attention at the time. (Id.) Again in September, Plaintiff made a mistake in recording a student's grade. Plaintiff quickly corrected the grade and the student emailed her to say that he had enjoyed her class. Bland alleges that Plaintiff's stated reason for the mistake was that Plaintiff didn't have time to read the directions. Plaintiff denies making this statement, and also states that she was not informed at the time that this was a problem. (Id.) Finally, on September 28, 2000 Plaintiff again volunteered to assist Cass with revising a test. Bland states that this assignment was not completed. However, Cass emailed Plaintiff and indicated

9

that the revisions were done to Cass' satisfaction.  (Id. at attach. 8-11)

At a meeting on October 11, 2000, Bland states that Plaintiff once again became angry and confrontational, while Plaintiff alleges that Bland was the confrontational party.  (Id. ex. M.)  Bland accused Plaintiff of not meeting with a student and later insulting that student, and not posting sufficient office hours during finals.  Plaintiff denies insulting the student and states that she met with the student later in the day after her lunch, and also notes that she was fully available to students during finals time.  (Id.)  Bland also states that in November Plaintiff refused to grade her own students' assignments.  Plaintiff counters by stating that she stayed late to grade assignments and, when she returned in the morning, there were no ungraded assignments.  No one indicated that Plaintiff had done anything wrong.  (Id.)  Finally, Bland states that Plaintiff submitted her Mission and Learning Support Plan late on December 4, 2000.  Plaintiff says that it was actually timely submitted in September, and that when she contacted Bland with a question about submitting her next Plan, Bland claimed not to have received her previous one.  (Id.)

On December 26, 2000, Bland drafted a written Recommendation of Discharge ("Recommendation") based on Plaintiff's conduct described above.  The Recommendation only listed as grounds for termination Plaintiff's actions from the December 9, 1999 meeting between Bland, Gee, and Plaintiff, until her alleged late submission of her Mission and Learning Support Plan on December 4, 2000.  The Recommendation specifically stated that Bland was "recommending [Plaintiff] for discharge due to insubordination and unacceptable performance." (Bland Aff. ex. C.)  Defendant's Human Resources Department received Bland's Recommendation and sent Plaintiff a letter informing her that her discharge was under consideration, and setting a pre-disciplinary meeting for January 2, 2001.  (Wagner Aff. ¶¶ 4, 5.)  This letter, however, did not reach

10

Plaintiff.  (<u>Id.</u> at ¶ 6; Nair Decl. ¶¶ 68, 69.)

As a result, on January 2, 2001 Plaintiff was in class teaching when Bland interrupted her class and informed Plaintiff that she was supposed to be in a pre-disciplinary meeting.  (Nair Decl. ¶ 67.)  Present at this meeting were Bland and Snider, along with Executive Director of Human Resources Tim Wagner ("Wagner") and Instructional Supervisor Tom Erney ("Erney").  Plaintiff informed the group that she had no advance notice of this meeting, to which Wagner and Snider both reacted skeptically.  (<u>Id.</u> at ¶¶ 68, 69.)  Nevertheless, Plaintiff was given a copy of the Recommendation and was allowed to submit written responses before the meeting resumed at a later date.  (<u>Id.</u> at ¶¶ 71, 74.)

Immediately after leaving the meeting, Plaintiff attempted to talk to Defendant's president, M. Valeriana Moeller ("Moeller").  Moeller refused to meet with Plaintiff, however, stating that it would be against Defendant's policy.  (<u>Id.</u> at ¶ 72.)  Plaintiff then went to consult with a professor in another department, Professor Karl Rieppel ("Rieppel"), who agreed to advise and guide Plaintiff through the procedural aspect of challenging the Recommendation.  (<u>Id.</u> at ¶ 73.)  Rieppel told Plaintiff that he thought most of the allegations were trivial, and that it appeared that Bland was looking for ways to get rid of Plaintiff.  (Decl. of Karl Rieppel ¶¶ 1-3, Pl. Mem. Contra, R. at 58 ("Rieppel Decl.").)

Plaintiff submitted her written responses to the allegations in the Recommendation on January 17, 2001, (Nair Decl. ¶ 77), and the remainder of the pre-disciplinary meeting took place that same day.  (Wagner Aff. ¶ 8.)  Bland, Snider, and Wagner conferred and, after discussing Plaintiff's work history and her responses to the Recommendation, decided to recommend Plaintiff's termination to Moeller on January 19, 2001.  (<u>Id.</u> at ¶ 9, ex. C.)  Plaintiff received notice of this

decision the same day. (Nair Decl. ¶ 79, ex. O.) Plaintiff appealed this decision on January 26, 2001 and, pursuant to Defendant's policy, a hearing before a Disciplinary Review Committee (the "Committee") was held on February 19, 2001. (Id. at ¶¶ 80, 81, ex. P.)

At the Committee hearing, Plaintiff was represented by a professor from another department, Professor Joan Bossenbroek ("Bossenbroek"), while Wagner represented Defendant. (Id. at ¶ 81; Wagner Aff. ¶ 11.) The Committee hearing lasted six hours, five and a half of which were devoted to hearing testimony from Bland and DED faculty members advocating for Plaintiff's termination. (McDowell Decl. ¶¶ 5, 19.) The Committee limited its review to the reasons for discharge Bland had listed in her Recommendation. The Committee did not accept testimony about incidents not listed in the Recommendation, nor vague testimony about student complaints and rudeness. (Id. at ¶ 17.) After the Committee hearing, Plaintiff overheard Sanchez state that she was "so glad" that Plaintiff had finally been before the Committee. (Nair Decl. ¶ 83.)

The Committee issued its report on February 27, 2001, and unanimously decided against terminating Plaintiff. The Committee grouped the allegations in Bland's Recommendation into three categories - insubordination and failure to follow protocol, job performance, and other - and found that none of them justified termination. The Committee found that Plaintiff was not insubordinate in her meetings with Bland on November 22, 1999, December 9, 1999, and January 27, 2000, and that Plaintiff followed protocol when requesting a substitute. (Id. ex. Q.) The Committee also found that Plaintiff had satisfactorily performed her job duties, particularly in regards to revising the two tests, as breakdowns in communication led to any problems that may have occurred. (Id.) Finally, the Committee deemed all of Bland's other allegations "trifling and routine imperfections of the academic shuffle" that did not warrant termination. (Id.) Particularly, the Committee found that

12

many of Bland's DED "policies" differed from those in other departments, and that charges of excessive student complaints against Plaintiff were, "without a doubt, not proven." (Id.) McDowell later stated that she was "astounded with the charges that [Bland] made against [Plaintiff], because they were so petty in substance.  The allegations were so petty that it appeared to [the Committee] that [Bland] was looking for things to try to set up [Plaintiff]." (McDowell Decl. ¶ 6.)  The day after the Committee's decision, Plaintiff received another letter from Snider congratulating her on her excellent student appraisal scores.  (Nair Decl. ex. Y.)

On February 29, 2001 the Committee forwarded its decision to Moeller.  Six days later, on March 5, 2001, eight members of the DED, including Laughbaum, Sanchez, and Branner, sent a petition to Moeller requesting a meeting to discuss their issues with Plaintiff, including "history of student complaints, effectiveness in the classroom, frequency of absences, compliance with department regulations and requests, conduct toward colleagues and students, behavior toward supervisors, [and] veracity of responses." (Id. at ¶ 86, ex. R.)  Despite refusing to meet with Plaintiff earlier, at some time between March 5 and 12, 2001, Moeller met with the complaining DED members (Aff. of Dr. M. Valeriana Moeller ¶ 5, Def. Mot. Summ. J. App. 5, R. at 54 ("Moeller Aff.")), which Rieppel asserts was highly unusual.  (Rieppel Decl. ¶ 6.)  At this meeting, the DED members raised only two issues beyond that which they had already presented to the Committee - the DED members' opinion that Plaintiff was not a team player, and an allegation that an unusual number of students left Plaintiff's classes early in the semester.  (Moeller Aff. ex. C.)  Additionally, during this time period Wagner also wrote to Moeller to complain about the Committee decision.  Wagner criticized the Committee's decision to exclude evidence relating to incidents not in Bland's Recommendation.  He also alleged that McDowell had heard Plaintiff's case before, which

McDowell denied.  (McDowell Decl. ¶ 19, ex. C.)

On March 12, 2001, Plaintiff received a letter from Moeller, delivered by Wagner.  While Moeller accepted the Committee's decision not to immediately terminate Plaintiff, Moeller informed Plaintiff that Plaintiff's teaching contract would not be renewed.  (Nair Decl. ¶ 87, ex. S; Moeller Aff. ¶ 6, ex. B.)  Moeller based her decision on the "compelling information from [DED] faculty," (Moeller Aff. ex. B), and on Bland's Recommendation, (M. Valeriana Moeller Dep. p. 40-41, Pl. Mem. Contra, R. at 59 ("Moeller Dep.")), as well as Moeller's own review of the evidence. (Moeller Aff. ¶ 6.)  Moeller did not discuss her decision with Bland because Moeller trusted Bland's opinion and judgment.  (Moeller Dep. p. 34.)  Moeller further decided to reassign Plaintiff to a nonteaching job for the remainder of her contract.  This resulted in Plaintiff losing pay (Nair Decl. ¶ 88, ex. T), as well as Defendant not treating Plaintiff as a full time faculty member despite still being under contract.  Plaintiff complains that Defendant removed her from email and substitute lists, and declined to review her promotion portfolio.  (Id. at ¶¶ 90-93, 96, ex. U, W.)  Defendant states that it took these actions because Plaintiff's contract would not be renewed.  (Snider Aff. ¶ 7-9.)  Wagner informed Plaintiff that, beginning on March 26, 2001, she would have to report to a different supervisor and workspace.  (Wagner Aff. ¶ 14.)

Plaintiff filed her first charge of discrimination with the Ohio Civil Rights Commission on March 27, 2001.  (Nair Decl. ¶ 90, ex. U.)  After repeatedly attempting to meet with Moeller, Plaintiff and Bossenbroek finally met with Moeller and Snider on May 21, 2001.  Plaintiff alleges that Moeller unfairly limited their discussion (Nair Decl. ¶ 97), while Moeller states that Plaintiff had no new evidence to present.  (Moeller Aff. ¶ 8; Snider Aff. ¶ 6.)  Plaintiff also attempted to submit her promotion portfolio directly to Moeller during this meeting, which Moeller refused on

Snider's advice.  (Moeller Aff. ¶ 9; Snider Aff. ¶¶ 7-9.)  On June 1, 2001 Moeller sent Plaintiff a

letter reiterating her decision not to renew Plaintiff's contract (Moeller Aff. ¶ 10, ex. C), and on June

30, 2001 Moeller did not renew Plaintiff's teaching contract.

Plaintiff filed her Complaint on June 14, 2002, alleging national origin discrimination and

retaliation in violation of both Title VII and Chapter 4112 of the Ohio Revised Code.  Plaintiff

requested back pay, front pay or reinstatement, compensatory and punitive damages, and reasonable

attorneys' fees.  (R. at 1.)  Plaintiff's case was initially dismissed for failure to comply with

discovery requests (Order, Apr. 20, 2004, R. at 31), but for good cause shown, this Court set aside

that judgment and allowed Plaintiff's case to resume.  (Mem. Op. & Order, Jan. 3, 2006, R. at 39.)

Defendant filed its Motion for Summary Judgment on March 30, 2007 (R. at 54), Plaintiff responded

on May 17, 2007 (R. at 58), and Defendant replied on May 31, 2007.  (R. at 64.)  Both parties filed

sur-replies (R. at 66; R. at 69), and these issues are now ripe for adjudication.

## II.    The Eleventh Amendment and Plaintiff's State Law Claims

Defendant argues that the Eleventh Amendment bars Plaintiff's state law claims under R.C.

§ 4112.01 *et seq*, Ohio's antidiscrimination statutes.  (Answer ¶¶ 28, 32, R. at 2; Reply p. 10, R. at

64.)  Plaintiff has not responded to this argument.

### A.    Relevant Law

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the United

States by Citizens of another State, or by Citizens or Subjects of any foreign state."  U.S. CONST.

amend. XI.  Despite its seemingly clear text, the Supreme Court has interpreted the Eleventh

Amendment, in light of "the structure of the original Constitution itself," Alden v. Maine, 527 U.S.

706, 728 (1999), as granting states broad sovereign immunity from federal suits brought by their own citizens as well as citizens of other states.  See Hans v. Louisiana, 134 U.S. 1 (1890); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 120-21 (1984).  This sovereign immunity extends to any suit against a state or an entity of the state, regardless of the relief sought.  Pennhurst, 465 U.S. at 101.

There are, however, three main exceptions to a state's sovereign immunity.  First, a state may, by statute, waive its sovereign immunity and consent to be sued in federal court.  Edelman v. Jordan, 415 U.S. 651, 673 (1974).  Courts "will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction."  Id.  The fact that a state has consented to be sued in its own courts, by itself, does not mean that the state has consented to suit in federal court.  Ford Motor Co. v. Dept. of Treasury, 323 U.S. 459, 465 (1945).  Second, the Eleventh Amendment does not bar suits against state officials that seek prospective, injunctive relief, in the form of an order compelling state officials to comply with federal law, even if compliance with such an order requires the expenditure of funds from the state treasury.  Ex parte Young, 209 U.S. 123 (1908); Edelman, 415 U.S. at 668 (noting, with respect to fiscal consequences of complying with orders for prospective, injunctive relief, that "[s]uch an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young").  Suits against the state itself, however, are still barred by the Eleventh Amendment, even though they request prospective relief only.  See Cory v. White, 457 U.S. 85, 90 (1982) ("It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought").  Third, Congress may abrogate the states' sovereign immunity if Congress "'unequivocally

expresse[s] its intent to abrogate the immunity' . . . [and acts] 'pursuant to a valid exercise of power.'" Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55 (1996) (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)). Congress "unequivocally expresses" its intent by using unmistakably clear statutory language. Dellmuth v. Muth, 491 U.S. 223, 227-28 (1989). Congress validly exercises its abrogation power only when the law in question was passed pursuant to section 5 of the Fourteenth Amendment.[5] Seminole Tribe, 517 U.S. at 59; see Fitzpatrick v. Bitzer, 427 U.S. 445, 455 (1976) (Title VII was passed pursuant to section 5 of the Fourteenth Amendment, and validly abrogates state sovereign immunity).

**B.    Analysis**

It is clear that Ohio's sovereign immunity bars Plaintiff's state law claims in this case. Defendant, a community college organized by the laws of Ohio for the exercise of the educational functions of state government, see R.C. § 1.60; Thacker v. Board of Trustees, 35 Ohio St. 2d 49, 298 N.E.2d 542 (1973), is an instrumentality of Ohio for sovereign immunity purposes, and the Eleventh Amendment is implicated. Plaintiff has sued the state itself, not any of Defendant's officials, and thus Ex parte Young's exception does not apply. Title VII is a valid abrogation of state sovereign immunity, see Fitzpatrick, 427 U.S. at 452-53, but Congress did not pass R.C. § 4112.01 et seq. and thus could not validly abrogate sovereign immunity on those claims. Furthermore, Ohio has not waived its sovereign immunity. While Ohio has waived its immunity from suit in state courts, see R.C. § 2743.02(A)(1), Ohio has not explicitly waived its immunity from suit in federal court. See Johns v. Supreme Court of Ohio, 753 F.2d 524, 527 (6th Cir. 1985). Ohio's anti-discrimination

---

[5] Section 5 states that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. CONST. amend. XIV, § 5.

statute similarly does not waive federal court immunity, as that statute simply authorizes a suit against the state as an employer in state court.  R.C. § 4112.051(A)(1).

Defendant is therefore immune from Plaintiff's state law claims, and this Court has no jurisdiction over Defendant as to these claims.[6]  The Court grants Defendant summary judgment on Plaintiff's state law claims.  Plaintiff's federal Title VII claims, however, remain.

### III.    Defendant's Motion for Summary Judgment on Plaintiff's Federal Claims

#### A.    Relevant Law

##### 1.    General Standard for Granting Summary Judgment

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of

---

[6] Defendant argues that "[t]he Eleventh Amendment . . . bars this Court's exercise of subject matter jurisdiction over Plaintiff's state law claims."  (Def. Reply p. 10, R. at 64.)  The Supreme Court, however, has indicated in Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381 (1998) and Lapides v. Board of Regents of the University System of Georgia, 535 U.S. 613 (2002) that the defense of sovereign immunity is more analogous to the defense of lack of personal jurisdiction, rather than lack of subject-matter jurisdiction.  In those cases, the Supreme Court noted that sovereign immunity is a defense that a state can either elect to raise in a case, or waive, Schacht, 524 U.S. at 388-89, and that a state may waive its sovereign immunity through its conduct.  Lapides, 535 U.S. at 624 (holding that a state's decision to remove a case to federal court constitutes a waiver of sovereign immunity).  In turn, the Sixth Circuit has noted that

> by creating a clear rule of waiver by removal, the Supreme Court has
> unequivocally rejected the view that, in cases over which the federal court
> otherwise has original jurisdiction, the additional "jurisdictional bar" erected by
> the Eleventh Amendment should be treated as a matter of "subject matter"
> jurisdiction rather than "personal" jurisdiction. . . . [T]he rule [regarding waiver
> by removal] is consistent only with the view that the immunity defense in cases
> otherwise falling within a federal court's original jurisdiction should be treated
> like the defense of lack of personal jurisdiction.

Ku v. State of Tennessee, 322 F.3d 431, 434-35 (6th Cir. 2003).  Therefore, the Court speaks in terms of lacking personal jurisdiction over Defendant as to Plaintiff's state law claims, rather than lacking subject-matter jurisdiction over those claims.

every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The

standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary] judgment . . . should be rendered if the pleadings, the discovery and
> disclosure materials on file, and any affidavits show that there is no genuine issue as
> to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter

of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial,

. . . [for] the purpose of the rule is not to cut litigants off from their right to trial by jury if they really

have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor

v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy,

39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if

there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978).

The court's duty is to determine only whether sufficient evidence has been presented to make the

issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of

witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that

no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.

Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as

inferences to be drawn from the underlying facts, must be considered in the light most favorable to

the party opposing the motion.  Matsushita, 475 U.S. at 587-88;  Wade v. Knoxville Util. Bd., 259

F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the

moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is

insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

### 2.    Title VII

#### a.    National Origin Employment Discrimination

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using the McDonnell Douglas framework set forth below, by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action. See Kline v. Tennessee Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).  A facially discriminatory employment policy or an express statement by a decision-maker of a desire to terminate employees because they belong to a protected class would constitute direct evidence of discrimination.  See Nguyen v. City of

21

Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

However, where the plaintiff has only circumstantial evidence of a discriminatory motive, claims under Title VII are analyzed under the framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). See Mitchell v. Toledo Hospital, 964 F.2d 577, 582 (6th Cir. 1992). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination. The elements of a *prima facie* case vary somewhat depending on the theory of discrimination being asserted. "A plaintiff who alleges discrimination on the basis of national origin . . . must prove four elements: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004).

If the plaintiff is successful in establishing a *prima facie* case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802-03. If the employer articulates such a reason, the presumption of discrimination drops away, leaving only the issue of "discrimination *vel non*." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000). The plaintiff must then prove, by a preponderance of the evidence, that the reason offered was pretextual. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the discharge; or (3) the proffered reason was insufficient to motivate the discharge. See Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994); Peters v. Lincoln Elec. Co., 285 F.3d 456, 471-72 (6th Cir. 2002). The

22

plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him. Burdine, 450 U.S. at 253.

### b. Retaliation

Title VII also contains an anti-retaliation provision. Title VII prohibits an employer from "discriminat[ing] against any of [its] employees or applicants for employment . . . because [they] have opposed any practice made an unlawful employment practice . . . or because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). Similar to an employment discrimination case, a plaintiff alleging retaliation can survive a motion for summary judgment by either presenting direct evidence, or by utilizing the McDonnell Douglas burden shifting framework. Harrison v. Metro. Gov't. of Nashville and Davidson Co., 80 F.3d 1107, 1118 (6th Cir. 1996).

When proceeding under the McDonnell Douglas framework, a plaintiff must first establish a *prima facie* case of retaliation. A plaintiff must show that (1) he or she engaged in protected activity; (2) the defendant knew of this excercise of protected rights; (3) the defendant either took a materially adverse employment action against the plaintiff that could dissuade a reasonable employee from making or supporting a charge of discrimination, or subjected the plaintiff to severe or pervasive retaliatory harassment from a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. Michael v. Caterpillar Financial Services Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing Burlington Northern and Santa Fe Railway Co. v. White, __ U.S. __, __, 126 S. Ct. 2405, 2415 (2006)).

If the plaintiff can establish a *prima facie* case of retaliation, the defendant must present a legitimate, non-discriminatory explanation for its actions. McDonnell Douglas, 411 U.S. at 802-03;

Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).  If the defendant presents

such an explanation, the plaintiff must then prove that the proffered reason is pretexual.  See

Burdine, 450 U.S. at 253.

**B.      Analysis**

**1.      National Origin Employment Discrimination**

While Plaintiff briefly states that there is direct evidence of discrimination in this case (Pl.

Mem. Contra p. 33, R. at 58), Plaintiff devotes her entire brief to arguing that she has satisfied

McDonnell Douglas' burden shifting requirements and does not articulate what that direct evidence

may be.  Therefore, the Court will analyze Plaintiff's claims using the McDonnell Douglas

framework.

**a.      Plaintiff's *Prima Facie* Case**

Plaintiff and Defendant agree that Plaintiff can establish three of the four elements of her

*prima facie* case of national origin employment discrimination.  In its initial Motion for Summary

Judgment, Defendant assumed that "Plaintiff could establish triable issues with respect to prongs

1 and 2 of a *prima facie* case of national origin discrimination."  (p. 14, R. at 54.)  While Defendant

initially disputed whether Plaintiff satisfied the fourth element (see id. p. 14-16), the parties have

since stipulated that Plaintiff was replaced by an individual outside the protected class.  (Stipulation

of the Parties, R. at 61.)  This satisfies the fourth element of Plaintiff's *prima facie* case, and thus

Defendant only disputes whether Plaintiff was qualified for her position.  DiCarlo, 358 F.3d at 415.

To establish that she was qualified for her position, Plaintiff "must show that her

performance met her employer's legitimate expectations at the time of her discharge."  Vincent v.

Brewer Co., __ F.3d __, __, No. 06-4138, 2007 WL 4409791, * 4 (6th Cir. Dec. 19, 2007).

24

Defendant asserts that it is "undisputed" that Plaintiff did not meet Defendant's legitimate expectations because of the number of student complaints, Plaintiff's "abrasive" attitude, and "multiple hostile exchanges" with Bland. (Def. Mot. Summ. J. p. 15, R. at 54.) The Court, however, notes first that Plaintiff does indeed dispute these allegations, and second that;

> a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination. Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff.").

Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574-75 (6th Cir. 2003) (en banc).

The Sixth Circuit in Wexler was very specific in setting forth what is required for a plaintiff to satisfy the qualification prong of the *prima facie* test:

> At the prima facie state, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. See Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution," and that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination"); MacDonald v. E. Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991) (holding that a plaintiff can show that she is qualified by presenting "credible evidence that she continued to possess the *objective qualifications* she held when she was hired") (emphasis added). The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

Id. at 575-76 (emphasis in original).

In light of these principles, the Court has no trouble in finding that Plaintiff was qualified

for her position.  The "minimum objective criteria" required for a mathematics instructor position at a postsecondary educational institution would certainly include advanced degrees in and knowledge of mathematics and the capacity for academic research, as well as skill in and enthusiasm for teaching and relating to students.  Plaintiff had bachelor's degrees from both American and Indian universities, as well as additional graduate work in India and a completed master's degree from an American institution.  (Nair Decl. ¶¶ 2, 3, 7.)  Additionally, Plaintiff was pursuing a Ph.D. at Ohio State University, had published articles and spoken at conferences, and had developed mathematics-related projects for Defendant.  (Id. ¶ 3, 7.)  The Court also notes that Plaintiff was nominated for a distinguished teacher award (Nair Decl. ¶ 51, ex. E) and consistently received letters from Defendant congratulating her on her high student evaluation scores.  The Court finds that Plaintiff has established that she was qualified for her position, and has thus established a *prima facie* case of national origin employment discrimination.

### b.      Defendant's Legitimate Non-Discriminatory Reason

Defendant must now come forward with a legitimate, non-discriminatory reason for refusing to renew Plaintiff's teaching contract.  McDonnell Douglas, 411 U.S. at 802-03.  This is a burden of production only, as the ultimate burden of persuasion rests at all times with the plaintiff.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).  "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  Id. (quoting Burdine, 450 U.S. at 254-55) (emphasis in original).

Defendant produces evidence of Plaintiff's "lack of collegiality and poor performance" in the form of Bland's Recommendation and President Moeller's decision not to renew Plaintiff's

26

contract to show that it had a legitimate and nondiscriminatory reason for it's decision not to renew Plaintiff's contract. (Def. Mot. Summ. J. p. 16, R. at 54; Def. Reply p. 5, R. at 64.) The Sixth Circuit has held that lack of collegiality is a legitimate and nondiscriminatory reason for terminating a faculty member because of the community atmosphere of faculty departments, see Stein v. Kent State University, 181 F.3d 103 (Table), No. 98-3278, 1999 WL 357752, * 5 (6th Cir. May 11, 1990), and thus Defendant has satisfied its burden of production.

The presumption of discrimination raised by Plaintiff's *prima facie* case now falls away, leaving only the ultimate issue of national origin discrimination. Reeves, 530 U.S. at 142-43. Viewing all the evidence in the light most favorable to Plaintiff as this Court must on summary judgment, see Matsushita, 475 U.S. at 587-88, the Court must now determine if Plaintiff can show that a genuine issue of material fact exists as to whether Defendant's articulated reasons for not renewing her teaching contract were pretextual. Vincent, __ F.3d at __, 2007 WL 4409791 at *6.

### c. Pretext

The Court finds that Plaintiff has submitted sufficient evidence to allow a reasonable trier of fact to conclude that Defendant's proffered reasons were pretextual. First, Plaintiff has submitted numerous instances of discriminatory comments made to her by DED faculty members and administrators, including

1) Bland's comments that "no matter how smart [Plaintiff] was, 'a light complected, African-American female' like Bland would always be more respected in society than 'someone dark skinned' like [Plaintiff]";

2) Bland's comments that foreigners cheat companies by finding excuses and special circumstances, after describing a friend who fired a Somalian woman for wearing traditional dress;

3) Bland's decisions, on two separate occasions, to not reimburse Plaintiff for lunch expenses incurred at conferences because of Plaintiff's vegetarianism,

27

including a statement that "'you people' would rather 'save a bunch of cows' than 'feed hungry people'";

4)      Additional comments from Bland and Branner about Plaintiff's vegetarianism and about Indians eating with their hands;

5)      Sanchez' and Laughbaum's comments mocking Plaintiff's accent; and

6)      Simmons' comment that the DED was "notorious" for mistreating foreigners.

The Sixth Circuit has held that discriminatory remarks may serve as evidence of pretext. <u>See</u> <u>Vincent</u>, __ F.3d at __, 2007 WL 4409791 at *7; <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 354-55 (6th Cir. 1998).  When assessing the relevancy of such remarks, courts look first to the identity of the speaker.  Isolated discriminatory remarks made by individuals with no authority over personnel decisions are generally not probative, but remarks made by those who "played a meaningful role . . . [or] may have influenced the [adverse employment] decision . . . may be relevant when the plaintiff challenges the motive behind that decision." <u>Ercegovich</u>, 154 F.3d at 355.  Courts must also look to the substance of the comments, and their relationship to one another. <u>Id.</u>  Isolated and ambiguous comments, as noted, usually do not support a finding of pretext.  Courts, however, "do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." <u>Id.</u> p. 356.

A reasonable factfinder, when reviewing these comments, could conclude that Defendant's proffered reasons for not renewing Plaintiff's contract did not actually motivate Defendant's decision, and were thus pretextual. <u>See</u> <u>Manzer</u>, 29 F.3d at 1084.  While neither Bland, Sanchez, Laughbaum, or Branner exercised ultimate authority over personnel decisions, they all played a meaningful role in and influenced the decision not to renew Plaintiff's teaching contract.  President

Moeller, who ultimately decided not to renew Plaintiff's contract, has stated that she based her decision on the "compelling information" the DED faculty, including Sanchez and Laughbaum, submitted to her when they met after the Committee decided not to recommend Plaintiff's termination. (Moeller Aff. ex. B.) Sanchez, additionally, was part of the group of DED faculty that allegedly met at a conference in 1999 and decided to "start documenting things" to get rid of Plaintiff. (Wallace Dep. p. 16, 74-76.) Moeller also admitted that she relied on Bland's Recommendation. (Moeller Dep. p. 40-41.) Contrary to Defendant's assertion, Plaintiff has alleged a "cat's paw"[7] theory in this case when she argues that "[i]f [D]efendant asserts that President Moeller was relying on what people in the department had told her, there is evidence from which a jury can conclude that President Moeller failed to make a reasonably informed and considered decision before taking [the] adverse employment action." (Pl. Mem. Contra p. 49, R. at 58.)

While some of the comments, such as Bland and Branner's comments concerning Plaintiff's vegetarianism and Bland's decision not to reimburse Plaintiff for lunch expenses, may not in and of themselves display discriminatory animus, they are buttressed by other comments, such as Bland's comments concerning Plaintiff's dark complexion, Sanchez' and Laughbaum's criticisms of Plaintiff's accent, and Simmons' comments about the DED's reputation with regard to foreigners. These comments are much more probative of national origin discrimination  Furthermore, a reasonable factfinder could construe Bland's comment that foreigners "cheat companies" as

---

[7] "Cat's paw" generally refers to an individual unwittingly used by another to accomplish a purpose. "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." E.E.O.C. v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 484 (10th Cir. 2006) (citing Ercegovich for the proposition that the Sixth Circuit has adopted this doctrine).

conveying a desire to terminate foreign employees because of the "special circumstances" they demand. Viewed together, and in the light most favorable to Plaintiff, these comments could support a reasonable factfinder's finding of an inference of discriminatory animus on the part of individuals who played a meaningful role in and influenced the decision not to renew Plaintiff's contract. Thus, they could support a reasonable factfinder in finding that Defendant's proffered reasons did not actually motivate the adverse employment action. See Vincent, __ F.3d at __, 2007 WL 4409791 at *7. The question before the Court, of course, is not whether Defendant's proffered legitimate, non-discriminatory reason was in fact pretextual, "but merely whether a factual dispute exists with respect to this question." Id. at *8.

Similarly, Plaintiff has presented evidence that would support a finding that Defendant's proffered reasons were insufficient to motivate the adverse employment decision. Id. at *7; see Manzer, 29 F.3d at 1084. Plaintiff refers to the Committee's decision that discounted all of Bland's proffered reasons for termination in her Recommendation. (Nair Decl. ex. Q.) The Committee found that Plaintiff had not been insubordinate, that allegations of excessive student complaints were not proven, that Plaintiff had satisfactorily performed her job duties, and that the rest of the allegations were "trifling and routine." (Id.) Furthermore, Plaintiff presents the affidavit of one of the Committee members, who stated that Bland's charges were "petty," and that it appeared as if Bland was looking for ways to get rid of Plaintiff. (McDowell Decl. ¶ 6.) While the Committee's recommendation is obviously not binding on this Court, and Defendant complains that the Committee improperly excluded evidence in the hearing, the Committee's report nevertheless raises a genuine issue of material fact as to whether the allegations in Bland's Recommendation, which clearly formed part of the basis for Moeller's decision, were sufficient to motivate the decision not

30

to renew Plaintiff's contract.  Whether the various incidents that formed the basis for Bland's Recommendation were indeed "trifling and routine," or were sufficient to support not renewing Plaintiff's teaching contract, is a heavily fact-specific question that is not appropriately resolved by summary judgment.

Defendant argues that Moeller's "independent review" of the evidence and her honest belief in the proffered nondiscriminatory reason means that Plaintiff cannot establish pretext.  (Def. Reply p. 9, R. at 64.)  The Sixth Circuit does recognize the "honest belief" rule, and has held that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. . . .  An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'"  Majewski v. Automatic Data Processing, Inc., 274 F.2d 1106, 1117 (6th Cir. 2001) (internal citation omitted).

In this case, however, genuine issues exist as to whether Moeller's reliance on Bland's Recommendation and the DED faculty members' statements was reasonable.  Moeller had received the Committee's report discounting all of Bland's purported reasons for termination, and was aware that the Committee felt that the allegations were not proven and were petty in substance.  Moeller, who had refused to meet with Plaintiff earlier, instead met with the DED faculty members to hear additional allegations against Plaintiff, which one of Defendant's faculty members deemed highly unusual.  (Rieppel Decl. ¶ 6.)  This group of DED faculty included Sanchez, Laughbaum, and Branner, all of whom Plaintiff alleges displayed a discriminatory attitude towards Plaintiff.  Moeller met with this group after explicitly refusing to meet with Plaintiff earlier.  Furthermore, after

31

meeting with the DED faculty members, Moeller never gave Plaintiff the same opportunity to present Plaintiff's side of the story. Moeller's decision to hear allegations from Plaintiff's adversaries, but not to extend to Plaintiff a fair opportunity to rebut those allegations, calls into question the reasonableness of Moeller's decision to rely on the DED faculty members' criticisms of Plaintiff. Moeller has also stated that she trusted Bland's opinion and judgment (Moeller Dep. p. 34), whom Plaintiff alleges discriminated against her based on Plaintiff's national origin. Whether or not Moeller acted unreasonably in relying on Bland's opinion, judgment, and Recommendation, and the DED faculty members' testimony is a factual issue that is not appropriately resolved through summary judgment. Defendant's Motion for Summary Judgment on Plaintiff's national origin discrimination claim is denied.

### 2. Retaliation

Defendant argues that Plaintiff has abandoned her Title VII retaliation claim by not addressing this claim in her response to Defendant's Motion for Summary Judgment. (Def. Reply p. 1, R. at 64.) This, however, is an inaccurate statement of the law. Rule 56 places the initial burden on the moving party to show that there is no genuine issue of material fact, and the movant must carry this burden to be entitled to summary judgment. Celotex, 477 U.S. at 325. "[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion . . . to ensure that [the movant] has discharged" the summary judgment burden. Carver v. Bunch, 946 F.2d 451, 455 (6th Cir. 1991). Therefore, the Court will examine Defendant's arguments as to Plaintiff's retaliation claim to determine if Defendant has met its initial summary judgment burden.

Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation because she

cannot show either that Defendant subjected her to a materially adverse employment action (prong 3), or that there was a causal connection between Plaintiff's decision to engage in protected activity and the materially adverse employment action (prong 4). (Def. Mot. Summ. J. p. 17-18, R. at 54). Without deciding whether Defendant's decisions to remove Plaintiff from her teaching duties, remove Plaintiff from the email and substitute lists, and not to review Plaintiff's promotion portfolio were materially adverse employment action, the Court agrees that Plaintiff cannot establish a causal connection between these decisions and her decision to engage in protected activity, i.e. filing a charge of discrimination with the Ohio Civil Rights Commission.

Defendant decided to remove Plaintiff from her teaching duties and lists, and not to review her promotion portfolio, at the same time as Defendant decided not to renew Plaintiff's teaching contract, that is, on March 12, 2001. Plaintiff did not file her charge of discrimination with the Ohio Civil Rights Commission until March 27, 2001. There is no way that Defendant's employment decisions could be causally connected to Plaintiff's decision to file a charge of discrimination weeks later. Defendant has satisfied its initial summary judgment burden to point out the absence of a genuine issue of material fact, and the Court will grant summary judgment to the Defendant on Plaintiff's retaliation claim.

## IV.    Conclusion

For the reasons set forth above, the Court **GRANTS** summary judgment to Defendant on Plaintiff's state law and Title VII retaliation claims. However, the Court **DENIES** summary judgment on Plaintiff's Title VII national origin discrimination claim.

**IT IS SO ORDERED.**

33

Date: February 19, 2008                    **/s/ John D. Holschuh**
                                           John D. Holschuh, Judge
                                           United States District Court